UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RENA RANGER, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 09-cv-6436 |
| CAROLYN COLVIN, Commissioner of Social Security, | ) |
| Defendant. | ) Judge Sharon Johnson Coleman |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Rena Ranger filed five separate lawsuits alleging discrimination by her former employer, the Social Security Administration ("SSA"). The cases were consolidated under the lowest numbered case. Defendant moves for summary judgment on all claims, arguing that there is no genuine issue of material fact that Social Security personnel did not subject her to discrimination, retaliation, or hostile work environment based on her gender, race, color, age, or disability. For the reasons stated below, this Court grants the motion.

**Local Rule 56.1**

Local Rule 56.1 sets forth the manner in which motions for summary judgment are to be submitted and responded to. This Court gave Ranger ample opportunity for argument and room for factual statements when it allowed a 34 page response brief and 80 statements of additional fact. Nevertheless, both Ranger's response to defendant's LR 56.1(a) statements of material fact and her LR 56.1(b)(3) statements of additional fact are replete with improper argument and unsupported statements. Accordingly, this Court will strike Ranger's responses to defendant's paragraphs 5-6, 8-9, 11-16, 18, 23-24, 29-31, 33, 36-38, 40-41, 43-46, 48, 50-53 and 55;

defendant's corresponding paragraphs are deemed admitted. *Midwest Imports, Ltd. v. Coval,* 71 F.3d 1311, 1317 (7th Cir. 1995).

With respect to Ranger's LR 56.1(b)(3) statements of additional fact, many are unsupported by the citation provided or did not provide citations to admissible evidence. Therefore, this Court will strike the following paragraphs: 3, 4, 5 (except the first sentence), 6, 7, 9, 10, 13, 14, 17, 18, 19, 21, 22, 25 (second sentence cites to Coplin deposition, which provides testimony opposite to that stated), 28, 29 (second and third sentences are not supported by the exhibits cited), 32, 33, 35, 36, 37 (first sentence in not contained in the cited exhibit), 38 (strike Martin), 39 (strike Martin and time, which was provided by counsel when he asked the question), 42 (foundation objection is sustained), 49, 51, 52 (refers to Debbie Tammeling instead of Debbie Ryniewski, whose name is on the email; last sentence is unsupported by cited exhibit), 53, 55, 56 (cited exhibit is an email being offered for the truth of the matter asserted and therefore is inadmissible hearsay), 57, 58, 59 (cited exhibit is a letter being offered for the truth of the matter asserted and therefore is inadmissible hearsay), 61, 63 (statement constitutes conclusion by Ranger and lacks foundation), 64, 65, 68 (plaintiff's paraphrasing alters the meaning of the testimony), 70, 72 (characterization of Doris Murray's workload is not supported by the exhibit), 73 (second sentence testimony is not supported by the declaration cited), 74 (second sentence is a legal proposition stated without authority that is improper in a LR 56.1 statement of fact), 76, 77, 79, 80. Further, the manner in which plaintiff submitted her exhibits made it more challenging for the Court to find the cited material.

**Background**

Plaintiff Rena Ranger was employed by the Social Security Administration for 40 years, having retired on December 3, 2010. Ranger began her employment at the Center for Security

and Integrity ("the Center") in 1991 as a security specialist. In 1999, Ranger was promoted to a team leader position. At the time of most of the events at issue, her supervisor was the Center director, Robert Coplin. Ranger was born in 1952 and makes references to the complexions of various employees and herself in her declarations. Judy Fredericks was the other team leader in the Center, having been promoted to that position from security specialist in 2001. Coplin's relationship with Ranger had gotten progressively worse since he started as Center Director. Communications between Ranger and the other team leader, Judy Fredericks, were strained.

On November 26, 2008, Ranger spoke to Mary Mahler, Assistant Regional Commissioner for Management and Operations Support, about Coplin's creation of an atmosphere of sexual favoritism with young female employees in the office. Mahler testified that Ranger sent her an email that made it clear that Ranger and her supervisor, Coplin, were not getting along. Mahler dismissed the time sheets that Ranger gave her as insufficient evidence of an inappropriate relationship between Coplin and a subordinate female employee. (Mahler Decl. May 2009).

*The PME and Transfer*

In August 2009, Mahler requested an outside Personnel Management Evaluation ("PME"), which is a diagnostic tool used by management to assess the climate in a work unit. A three-person team provided by the Office of Management and Operation Support conducted the PME. Mahler testified that she "looked into [Ranger's allegations] by ordering a PME." (Mahler Dep. at 73:4 – 74:3). Coplin testified, when asked, "What information had Jim [Martin] been given by you or your boss to trigger [a Performance Management Evaluation]?" that "Rena had written a very long memo to Mary Mahler and had a meeting with Mary Mahler apparently alleging that I was having affairs… it was a rather scathing memo." (Coplin Dep. at 90:3-10).

3

The PME team conducted its evaluation over two days in May 2009. They interviewed all Center employees, including Coplin, and the team leaders. The PME team submitted a report to Mahler that stated morale in the Center was low. Six out of the fifteen employees interviewed attributed the low morale to Ranger's management style, though the report also contained criticism of Coplin. Most employees interviewed described employee-to-employee communication as good, but described management-to-employee communications as less effective. A number of the employees interviewed stated that friction between members of the management team negatively impacted communications. Coplin testified that employees do not normally receive a copy of a PME report. (Coplin Decl. Nov. 2010 at 2).

The PME report recommended reassigning or detailing Ranger to a different position, finding that Ranger had created a negative feeling with the staff, was unable to deal effectively with the management team, had shared confidential information and that a change in the management team might be the best solution to address the component's problems. Mahler agreed with this recommendation and decided to reassign Ranger to a program expert position at the same grade and pay as her team leader position. (Mahler Decl. May 2009 at ¶ 7). Mahler explained that she ordered the transfer because she believed Ranger was a detriment to the morale of the Center, that she did not work well with Coplin or her fellow team leader Fredricks, and that she did not relate well with other Center employees. She further stated that other employees found Ranger unprofessional, condescending, and avoided dealing with her. Mahler testified that she detailed Ranger to a position at the Center for Material Resources, Facilities Section, to allow time for relations to improve and to offer Ranger a new opportunity. *Id.* Mahler testified that the reassignment and detail to a different location was not a demotion, but a different job at the same pay and grade that would allow Ranger to get different experience.

(Mahler Decl. Aug. 2010 at ¶ 3). Coplin did not reassign Ranger nor arrange for the detail. (Coplin Decl. Jan. 2010 at ¶ 3). Ranger's detail ended in April 2010 and she was reassigned to a non-supervisory technical expert position at the same grade in her prior work unit. (Coplin Affidavit, Nov. 2010 at 1). Ranger retired from the Social Security Administration on December 3, 2010.[1]

As her immediate supervisor, it was part of Coplin's job to conduct employee evaluations. Coplin gave Ranger a rating of "successful contribution" in 2008 and 2009, though her ratings in individual categories varied. Judy Fredericks, the other team leader in the Center, also received successful ratings. Coplin testified that he gave Ranger a lower evaluation for FY 2008 because "she does not come out of her office." (Coplin Decl. May 2009 at ¶ 30). Coplin testified that he forgot to give Ranger a performance plan in 2009, and in such situations the prior performance plan remains in effect. Coplin did provide Ranger with a mid-year and final review in 2009. Between March 2002, and April 2008, Ranger received five individual performance awards. Ranger never received any written reprimands from Coplin or any previous supervisor concerning her alleged communication problems, discourteousness or condescension prior to the PME. (Coplin Dep. at 80:2-15). Coplin testified that he received oral complaints about Ranger and that the complaints began escalating in 2008. *Id.* at 49:23-24; 50:1-14.

Coplin testified that Ranger and Fredericks were able to recommend employees for awards because they were team leaders, but the decision whether to give an award and the nature of the award belonged to Coplin as Center Director. *Id.* at ¶ 15. Coplin testified that he did not exclude Ranger from management decisions and that, although Fredericks would regularly consult him and seek his approval, Ranger would not. *Id.* at ¶ 17.

---

[1] Plaintiff disputes that Ranger retired voluntarily, but cites to no record evidence to contradict this statement.

5

*Other Complaints and Issues*

On March 17, 2009, Ranger informed Coplin that Debbie Rysniewski angrily and rudely barged into Ranger's office because she received an email message from Ranger asking her for accountability on the ROAD Security Review Assignment.

Ranger claimed $347 for a taxi fare to an off-site training venue, which was denied in part because less expensive transportation was available to Ranger. (Def. Ex. 19, Travel Voucher at 4). Ranger was reimbursed for the "maximum reimbursable" amount of $89.00. *Id;* Coplin Decl. June 2011 at ¶ 14. Ranger testified that she was not reimbursed at all. Coplin testified that night differential and overtime are not allowed while in travel status, and that this is why Ranger was not paid overtime for attending a training class in September 2010. (Coplin Decl. June 2011 at ¶ 32).

Coplin testified that he made a private statement to Judy Fredericks in 2010 that was similar to the following, "If she was on fire, and I had the water to put it out, I wouldn't pour it on her." (Coplin Decl. June 2011 at ¶ 23). Coplin testified that he was not referring to Ranger and the conversation was intended to be private. *Id.*

Alice Gronkowski, a Caucasian woman over 40 years of age, was on Ranger's team when Coplin arrived at the Center. She testified that she requested reassignment in 2005 partly because of Coplin. She further stated, "I found the atmosphere uncomfortable." (Gronkowski Decl. May 2009 at 1-2). Gronkowski testified that, on one occasion, Coplin showed the staff a video in which a man has intercourse with a horse. Gronkowski also testified that Coplin pointed his cellphone at various angles to "humorously" illustrate how a female employee in another office captured nude images of herself before sending them to her supervisor. *Id.* Gronkowski also

testified that she observed Coplin "twirling" Jackie Diamond's hair and that Diamond "did not appear to object to this behavior." *Id.*

Coplin denies engaging in inappropriate behavior with any female employees. (Coplin Decl. May 2009 at ¶ 5). Coplin testified that he recalled "having a discussion with Ms. Diamond about her fingernails and jewelry." *Id.* at ¶ 6. He testified that any closed-door meetings with employees concerned training the newer employees. *Id.* Coplin also testified that it was coincidence that he and a younger female employee left the office at the same time on occasion. *Id.* at ¶ 8. Coplin testified that the bag he gave Debbie Tammeling was from her sister, who also works in the building and who asked him to deliver it when she saw Coplin entering the building. *Id.* at ¶ 10. Ranger accuses Coplin of making a threatening gesture. Although he denies making the gesture, Coplin conceded in his deposition that placing the hand to the head in the shape of a gun should be seen as threatening and would have the effect of demeaning the person to whom it was directed. (Coplin Dep. at 18:2-10, 21-24, 19:1). Coplin never received any disciplinary action. (Mahler Dep. at 10:18-20).

*Accommodation Requests*

On April 7, 2009, following surgery on her right wrist, Ranger requested Dragon Speaking Naturally Software (DNS) as an accommodation. (CDS Records at CDS000129). That same day, Coplin recommended approval of the request pending receipt of medical documentation and forwarded the request to the Social Security Administration Office of Civil Rights. (CDS Records at CDS000130; Coplin Decl. Nov. 2010 at 2). Ranger submitted a letter from Dr. Craig Phillips, dated April 23, 2009, in support of her request for accommodation. (CDS Records at CDS000010). Dr. Phillips stated that due to a recent surgery involving an incision on her palm, Ranger had a temporary condition that "bothers her with computer

activities." *Id.* He suggested that Ranger either take frequent breaks or get voice-activated software to minimize her typing workload. *Id.* Dr. Phillips indicated that the condition would last approximately 4-6 weeks. *Id.* The Social Security Medical Director testified that Dr. Phillips' letter did not demonstrate that Ranger was substantially limited in a major life activity and that the documentation shows that her request was in the immediate post-operative period, after which the need for accommodation would likely subside as her condition improves. (Hexter Decl. and Report at 2). On May 20, 2009, Doug France of the Social Security Office of Civil Rights and Equal Opportunity Center for Disability Services (CDS) wrote to Ranger inviting her to submit additional documentation if she believed the agency's decision was in error. (CDS000016-17).

On July 10, 2009, Ranger submitted a request for a computer desk and adjustment of her mouse. (CDS000019, CDS000170-171). Coplin recommended approval of the request. (CDS000171). AnnJoy Lieberman of the Center for Disability Services was able to instruct Ranger on how to make workstation adjustments. (CDS000020). Ranger was able to make the adjustments and she "made the Mouse switch and it works." *Id.*

On July 26, 2010, Ranger submitted a second request for Dragon Naturally Speaking Software. (CDS00166-168). Coplin again recommended approval pending medical documentation. (CDS00167). Ranger submitted medical documentation in the form of a letter from Dr. Schafer in which he stated that he "may" recommend continued activity modification with time off work and physical therapy.[2] (CDS000040; Hexter Decl. and Report at 3). Dr. Schafer did not make any such recommendations in his letter nor did he list any activity modifications in his letter dated August 31, 2010. (CDS000102). The CDS had a doctor review Ranger's medical documentation in support of her request and found that it did not describe any

---

[2] Plaintiff's objection to Ranger's medical records not being filed as an exhibit is overruled.

activity limitations or modifications and therefore was insufficient to enable CDS to evaluate whether voice-activated software would be an effective accommodation or if there were alternatives such as a light touch keyboard, ergonomic keyboard, or a left-handed keyboard. (CDS000074-5). Dr. Hexter, SSA Medical Director, testified that the CDS tries to match the accommodation to the employee's specific limitation and voice-activated software is not always the most effective means of accommodation. (Hexter Decl. and Report at 3). On January 12, 2011, CDS wrote to Ranger that it was unable to approve her request because the medical documentation she submitted was insufficient to support her specific request, but she could supplement her documentation. (CDS000076-77)

In July 2010, Ranger also submitted a request for enhanced overhead lighting. (CDS00163-165). Coplin recommended approval pending medical documentation and forwarded the request to the CDS. (CDS00165). On November 15, 2010, the SSA Regional Opportunity Manager wrote to Ranger to inform her that they had not received the additional medical documentation requested to support her accommodation request. On November 22, 2010, Ranger submitted a letter from Dr. Carole Prete stating that Ranger suffered from intermittent blurred vision due to her diabetes. (CD000118). The letter does not describe Ranger's diabetes or how it limits her life activities. *Id.* The SSA did not act on the letter from Dr. Prete because Ranger retired on December 3, 2010.

*EEO Activity*

Ranger provided witness testimony in Doris Murray's EEO case. (Coplin Dep. at 29:14-17, 20-21). Doris Murray was a GS-13 Management and Program Analyst the Center between 2006 and 2009. Murray testified that Coplin displayed sexual behavior in the office with a younger female employee and that it "brought morale down and caused hurt feelings and created

a hostile work environment…. Sometimes you have situations where people try and cover up what they are doing and keep it low key, but Mr. Coplin was blatant, he took deliberate pride in his unprofessional, sexual disturbing behavior." (Murray Decl. June 2009).

Coplin held a meeting with Fredericks and Ranger before Doris Murray reported to work in the Center. It is undisputed that Coplin did not want Murray working for him. Coplin acknowledged making various statements questing Murray's motivation to continue her employment. (Coplin Dep. at 28:20-24). Coplin assigned Murray a disability determination services workload profile involving nine locations in six states with approximately 3000 employees. *Id.* at 25:18-22.

On August 7, 2009, Ranger wrote a letter to Commissioner of Social Security Michael Astrue, with copies to former Commissioner of Social Security Linda McMahon, and Mahler's supervisor, James Martin, in which she stated in very general terms that she was a 38-year veteran employee being personally abused and humiliated by her managers, and that she wanted the mistreatment to stop. Following her retirement on December 3, 2010, Ranger filed a formal EEO complaint on January 21, 2011. The complaint does not include a constructive discharge claim. Both Coplin and Mahler provided declarations in five EEO cases responding to Ranger's allegations.

**Legal Standard**

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,*

477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id*. at 255. If it is clear that the plaintiff will be unable to satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999); *Slowiak v. Land O'Lakes, Inc*., 987 F.2d 1293, 1295 (7th Cir. 1993).

**Discussion**

In her four-count consolidated complaint [Dkt. 63] Ranger alleges race and color discrimination[3] (Count I and II), age discrimination (Count III), and disability discrimination[4] (Count IV). Ranger asserts that defendant discriminated against her by treating her less favorably than those similarly situated, creating a hostile work environment, and retaliating against her for opposing what she believed to be unlawful harassment culminating in her constructive discharge. Defendant moves for summary judgment on all counts. For simplicity, this Court will first address Ranger's disability claim and then discuss the issues of discrimination, retaliation, and

---

[3] In Count II Ranger alleges race and color discrimination in violation of 42 U.S.C. § 1981 however section 1981 does not apply to employment discrimination suits brought by federal employees. *See Espinueva v. Garrett*, 895 F.2d 1164, 1165 (7th Cir. 1990). This Court will therefore consider her claim for race and color discrimination only pursuant to Title VII (Count I).
[4] The Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* does not apply to federal employees and therefore this Court will treat Ranger's claim for disability discrimination as brought pursuant to the Rehabilitation Act of 1973, 29 U.S.C. §701 *et seq. See Mannie v. Potter*, 394 F.3d 977, 982 (7th Cir. 2005).

11

hostile work environment as each relates to race or color and age, and finally this Court will consider whether Ranger can bring her constructive discharge claim.

I.   *Disability*

Ranger asserts that she is disabled, suffering from carpal tunnel syndrome and vision problems. Ranger alleges that defendant discriminated against her by failing to reasonably accommodate her disability and by failing to take appropriate remedial action by engaging in an interactive process. Defendant argues that the undisputed record evidence demonstrates that the SSA engaged in an interactive process with Ranger, provided reasonable accommodation for her carpal tunnel syndrome, and that Ranger failed to provide adequate medical documentation for her request for additional lighting.

Under the Rehabilitation Act, Ranger must show that she: (1) falls within the Americans with Disabilities Act's statutory definition of "disabled," meaning that she has a "physical or mental impairment that substantially limits a major life activity, a record of such impairment, or [is] regarded as having such impairment." 42 U.S.C. § 12102(2); (2) is otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (3) has suffered an adverse employment decision because of the disability. *Gang v. Potter,* 521 F.3d 731, 736 (7th Cir. 2008).

Here, there is no evidence in the record to dispute that the SSA reasonably accommodated her disability. The record demonstrates that the SSA engaged in an interactive process with Ranger, who requested voice-activated software and enhanced lighting, but that Ranger failed to provide medical documentation to support those requests. The SSA did make adjustments to Ranger's work-station, desk, and computer mouse to accommodate her carpal tunnel syndrome, which Ranger admitted resolved the issue in an email to AnnJoy Lieberman of

the Center for Disability Services. (CDS000020). The record indicates that the SSA requested additional medical documentation for Ranger's blurred vision, but that she retired before responding to the request. Further, there is no evidence in the record to show that Ranger suffered any adverse employment decision because of her disability. The SSA concedes that Ranger's transfer was an adverse employment decision even though her salary did not change. Yet, there is no evidence, and Ranger does not argue, that her transfer was in any way related to her disability. Finally, Ranger appears to have abandoned that claim by failing to argue in opposition to it or present any evidence to support her claim. Therefore, this Court grants summary judgment on this issue in favor of defendant.

## II. Race, Color, and Age Discrimination

*1. Discrimination and Retaliation*

Ranger alleges that the SSA discriminated against her on the basis of race, color and age. Defendant argues that there is no evidence to support Ranger's claims. There are two accepted methods of proving discrimination in violation of Title VII; the direct evidence method and the indirect evidence method.

Under the direct method, a plaintiff must present evidence: (1) that she engaged in a protected activity, (2) that she was subjected to an adverse employment action, and (3) that there was a causal connection between the protected activity and the employment action. *Hobgood v. Illinois Gaming Board,* 722 F.3d 1030, 1036 (7th Cir. 2013). There are two ways a plaintiff may satisfy the direct method; first, through direct evidence of <u>causation</u>, which requires something "akin to an admission from [the defendant] that it took action against [the plaintiff] because of this protected activity." *Id.* at 1038 (citing *Raymond v. Ameritech Corp.,* 442 F.3d 600, 610 (7th Cir. 2006). A plaintiff may also satisfy the direct method using what the Seventh Circuit Court of

Appeals has referred to as "a convincing mosaic of circumstantial evidence." *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004). This way of satisfying the direct method relies on evidence of suspicious timing, ambiguous statements or behavior towards other employees in the protected group, statistical or some other evidence that similarly situated employees outside of the protected group systematically receive better treatment, and evidence that the employer offered a pretextual reason for an adverse employment action. *Hobgood,* 722 F.3d at 1038. "The ultimate question the parties and the court always must answer is whether it is more likely than not that the plaintiff was subjected to the adverse employment action because of his protected activity." *Id.*

Ranger asserts that defendant discriminated against her as an EEO participant. Indeed, the only "protected class" that Ranger argues that she is a part of is that of EEO activity participant. (Pl.'s Response Br., Dkt. 113 at 12, 17; "Ranger is claiming that she was the target of discrimination based on her EEO activity"). Title VII prohibits discrimination on the basis of race, color, religion, sex, or national origin. *See* 42 U.S.C. § 2000e-2. EEO activity participant does not constitute a "protected class" under Title VII.[5] Therefore, Ranger cannot establish that she has been discriminated against as an EEO activity participant.

Ranger's complaint alleges race, color, and age discrimination, however in her brief she has not claimed membership in those protected classes. Even if she had asserted membership in those protected classes, there is no direct or circumstantial evidence that Ranger's reassignment was related in any way to either her race or her age. Both Ranger and Coplin are African

---

[5] "The antidiscrimination provision [of Title VII] seeks a workplace where individuals are not discriminated against because of their racial, ethnic, religious, or gender-based status. The antiretaliation provision seeks to secure that primary objective by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees. The substantive provision seeks to prevent injury to individuals based on who they are, i.e., their status. The antiretaliation provision seeks to prevent harm to individuals based on what they do, i.e., their conduct." *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 63 (2006).

American and, as already mentioned, the only references to race in the record come from Ranger. Although Ranger asserts that Coplin favored younger female employees, there is no evidence of what age the employees were or that Coplin ever made any remark or statement with respect to Ranger's relative age. Similarly there are no allegations and no evidence that Mahler discriminated against Ranger based on either age or race. The record shows that Mahler recommended reassignment of Ranger from her position based on the results of the PME report completed in May 2009. Therefore, this Court finds that Ranger fails to satisfy the direct method of proof as to race and age discrimination.

The second method by which Ranger may establish discrimination is the indirect method outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). To make out a prima facie case of discrimination using the indirect method, Ranger needs to present evidence that she (1) engaged in statutorily protected activity, (2) met her employer's legitimate expectations, (3) suffered an adverse employment action, and (4) was treated less favorably than similarly situated employees who did not engage in the statutorily protected activity. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 666 (7th Cir. 2006). "If the employee has evidence on each of these four elements of the prima facie case, the burden shifts to the employer at the second step of the indirect method to articulate (but not necessarily prove) a legally permissible reason for the adverse employment action." *Vaughn v. Vilsick*, 715 F.3d 1001, 1006 (7th Cir. 2013). If the employer provides a legally permissible reason for the adverse employment action, the analysis moves to a third step, in which the employee must show that the employer's stated reason is false, and falsity permits a reasonable inference that the real reason was unlawful." *Id.*

Here, even if Ranger establishes a prima facie case of discrimination, the SSA has proffered a legally permissible reason for Ranger's transfer, which Ranger cannot show is false.

While it is undisputed that Ranger's complaint to Mahler about Coplin's behavior toward younger female employees triggered the investigation and PME, her transfer was documented to be in response to a low morale problem caused by Ranger. Ranger provides no affirmative evidence to contradict the SSA's assertion that she was transferred based on the recommendation in the PME. Ranger argues that the PME results were pretext for her transfer because the three outside observers enlisted to conduct the PME, actually worked for Mahler. However, there is nothing besides Ranger's own statement to support that contention and there is no foundation for that assertion. Therefore, this Court finds that Ranger has not met her burden under the indirect method to show discrimination of any kind.

Retaliation claims operate under the same analytic framework as a discrimination claim. *See Vaughn*, 715 F.3d at 1006. This Court finds that there is no genuine issue of material fact as to retaliation for same reason that her discrimination claims fail under the indirect method. Under the direct method, there is nothing in the record that would constitute an admission that Ranger was transferred to a different work detail because she complained of what she perceived to be sexual harassment and favoritism by Coplin. Nor has Ranger offered any evidence, besides her own testimony, to present a "convincing mosaic of circumstantial evidence" of retaliation. *See Hobgood,* 722 F.3d at 1038. The record shows that there was a great deal of animosity between Ranger and Coplin, but any animus expressed by Coplin is insufficient to show retaliation because he did not make the decision to transfer Ranger.[6] *See Petts v. Rockledge Furniture LLC*, 534 F.3d. 715, 721-22 (7th Cir. 2008) (stray remark not made by decision-maker and unrelated to employment decision could not raise inference of discrimination). Moreover, there is nothing from which this Court can infer that the animosity between them stemmed from Ranger's

---

[6] This Court is mindful of the fact that Coplin never received any discipline for what appears to be inappropriate office behavior that was also critiqued in the PME report. Nevertheless, Coplin played no role in the decision to transfer Ranger and thus there is no evidence to support a retaliation claim.

complaint to Coplin and Mahler about Coplin's behavior toward younger women in the office. *See Id*; *Fleishman v. Continental Cas. Co.*, 698 F.3d 598, 604-05 (7th Cir. 2012) (absent age-related context, ambiguous comment that manager was "out to get" plaintiff could not overcome summary judgment on plaintiff's age discrimination claim); *Dass v. Chicago Bd. of Ed.*, 675 F.3d 1060, 1072 (7th Cir. 2012) (ambiguous comment unrelated to adverse action was insufficient, without more, to defeat summary judgment). Accordingly, this Court finds that Ranger cannot establish a prima facie case of retaliation.

*3. Hostile Work Environment*

In order to prevail on her claim of hostile work environment, Ranger must demonstrate: (1) her work environment was both objectively and subjectively offensive; (2) the harassment was based on her membership in a protected class; (3) the conduct was either severe or pervasive; and (4) there is a basis for employer liability. *Dear v. Shinseki,* 578 F.3d 605, 611 (7th Cir. 2009). Ranger cannot establish any of the first three elements based on the record.

First, her claims of hostile work environment are entirely subjective and based almost exclusively on her own perceptions. Ranger offers the testimony of her therapist, Sandra Derks, who simply recounts what Ranger told her and concludes that Ranger suffered from severe job stress. Doris Murray's declaration is also of little help to Ranger's claim, though she states that Coplin treated Ranger with disrespect, the examples she provides are that Coplin held a few meetings without Ranger, he made some changes while Ranger was on vacation to a project she was leading, and he did not inform her in advance of some changes to a meeting agenda. (Doris Murray Decl., Pl. Ex. 28 at ¶ 17-19.) None of these workplace slights rise to the level of a hostile work environment.

Second, there is no indication from anything in the record that these recounted instances where Coplin left Ranger out had anything to do with Ranger's membership in a protected class. Ranger does not point to any slurs or references to her age, race, or disability. *Cf. Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 950 (7th Cir. 2005) (hostile work environment found where the plaintiff was subjected to graffiti calling him a "spic" and "wetback," directing him to "go back to Mexico," and proclaiming "KKK" and "white power," even though each individual epithet appeared in isolation). This Court notes, yet again, that it is clear that Coplin and Ranger did not get along, but there is nothing to support an inference that their disagreements and slights were more than a personality clash.

Third, there is likewise nothing showing that the alleged conduct was pervasive or severe. While Ranger may feel that Coplin's disrespect was severe and pervasive, her subjective feelings do not rise to the level of actionable hostility. "'[P]ersonality conflicts at work that generate antipathy' and 'snubbing by supervisors and co-workers' are not actionable under Title VII, *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (quoting 1 B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3d ed. 1996)), and we think that getting a 'cold shoulder' from your boss easily falls within this non-actionable category." *Brown v. Advocate S. Suburban Hosp. & Advocate Health & Hosps. Corp.*, 700 F.3d 1101, 1107 (7th Cir. 2012). Moreover, Ranger admits the sexual harassment of which she complained was not directed at her. *See Rhodes v. Illinois Dep't of Trans.*, 359 F.3d 498, 505 (7th Cir. 2004) ("To prevail on a claim of sexual harassment based on hostile work environment, a plaintiff must establish that… the conduct was directed at her because of her sex."). Accordingly, this Court finds that no reasonable trier of fact could find Ranger was subjected to a hostile work environment.

*4. Constructive Discharge*

Ranger asserts that she was forced to separate from her employment on December 3, 2010, and argues that she resigned involuntarily because of the hostility and retaliation that she experienced at work. Defendant argues that Ranger failed to exhaust her administrative remedies by not making a claim of constructive discharge in her formal EEO complaint in January 2011. Relying on *Erkan v. Illinois Dep't of Corr.*, 04C1550, 2006 WL 3087109, 2006 U.S. Dist. LEXIS 79728 (N.D.Ill. Oct. 27, 2006), Ranger argues that this Court should allow her constructive discharge claim despite its omission from her formal EEO complaint because it is based on the same conduct as her claims in the EEO complaint. Even if this Court were to find that a constructive discharge claim is encompassed with Ranger's other claims, it is simply unsubstantiated in the record such that it could survive summary judgment. *See Lavalais v. Vill. of Melrose Park*, 2013 U.S. App. LEXIS 21682 (7th Cir. Oct. 24, 2013).

Constructive discharge occurs when the plaintiff shows that she was forced to resign because her working conditions had become unbearable from the standpoint of the reasonable employee. *Pa. State Police v. Suders*, 542 U.S. 129, 147, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004); *Roby v. CWI, Inc.*, 579 F.3d 779, 785 (7th Cir. 2009). The Seventh Circuit recognizes two forms of constructive discharge. *See Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 333 (7th Cir. 2004); *EEOC v. Univ. of Chi. Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002). The first requires a plaintiff to show that she suffered discriminatory harassment that is even more egregious than the high standard required to show a hostile work environment. *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010); *Tutman v. WBBM-TV, Inc./CBS, Inc.,* 209 F.3d 1044, 1050 (7th Cir. 2000). The second form of constructive discharge occurs, "[w]hen an employer acts in a manner so as to have communicated to a reasonable employee that she will be

19

terminated. . . ." *Chapin*, 621 F.3d at 679 (quoting *Univ. of Chi. Hosps.*, 276 F.3d at 332)). "In this situation, if the plaintiff employee resigns, the employer's conduct may amount to constructive discharge. This form of constructive discharge, however, does not eliminate the need for the plaintiff to show that his working conditions had become intolerable." *Id.* (internal citations omitted.)

Ranger can prevail in neither form of constructive discharge. First, this Court's conclusion that Ranger cannot establish a basis for a hostile work environment claim compels the conclusion that the SSA is entitled to summary judgment on her constructive discharge claim as well. Second, there are no allegations and nothing in the record to suggest that anyone communicated to her that she would be terminated. Accordingly, the SSA is entitled to summary judgment on this claim.

**Conclusion**

Based on the analysis above, this Court grants defendant's motion for summary judgment, finding no genuine issue of material fact exists on any of Ranger's claims and defendant is entitled to judgment as a matter of law.

IT IS SO ORDERED.

Date: November 5, 2013                    Entered: _____
                                                     United States District Court